UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

E.B., individually and on behalf of S.B.,

                              Plaintiff,

           -v-

NEW YORK CITY DEPARTMENT OF
EDUCATION,

                        Defendant.

------------------------------------------------------------ X

<div style="border:1px solid;">
USDC SDNY<br>
DOCUMENT<br>
ELECTRONICALLY FILED<br>
DOC #: _____<br>
DATE FILED: July 12, 2016
</div>

15-cv-4998 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

     Plaintiff E.B. brings this action on behalf of her daughter S.B., alleging that defendants failed to provide S.B., who is intellectually disabled, a free appropriate public education ("FAPE") in the 2012-13 school year as required under the Individuals with Disabilities Education Act ("IDEA"). Plaintiff claims that defendant's recommended placement school was unable to implement S.B.'s Individualized Education Plan ("IEP") and thus deprived her of a FAPE. Defendants argue that plaintiff's claims are impermissibly speculative and constitute impermissible attacks on the IEP itself.

     For the reasons set forth below, plaintiffs' motion for summary judgment is DENIED and defendants' cross-motion is GRANTED.

I.     BACKGROUND

A.     The Student

S.B. was born in 1997.  At the start of the 2012-13 school year, she was

fourteen years old.  (Ex. 2, 4.)[1]  S.B. had attended Cooke Center Academy ("Cooke"),

a private special education school, since she was seven years old.  (Tr. 408-09.)

S.B. is intellectually disabled and has had a history of physical, motor,

sensory, speech, and language deficits.  (Exs. 2, 4, 5, 6, 7.)  According to her

psychoeducational evaluation dated March 2011, she achieved a full scale IQ of 40

on the Wechsler Intelligence Scale for Children IV, with deficient index scores in

each sub-test.  (Ex. 6 at 2.)  On the Woodcock Johnson III test, S.B. achieved grade

equivalent scores of kindergarten or 1st grade and scores of zero or 1 on the relative

proficiency index in all sub-areas.  (Ex. 6 at 6.)  A progress report from Cooke from

February 2012 indicated that S.B.'s reading, writing, and math instructional levels

were at a pre-kindergarten, kindergarten, or 1st grade level.  (Ex. 4 at 3-5.)

According to a Functional Behavior Assessment dated February 2012, S.B.

had targeted inappropriate behavior including becoming easily frustrated, refusing

to "engage in her work when the conditions do not suit her," and occasionally

leaving the classroom without permission.  (Ex. 8 at 1.)

B.     The CSE Meeting and IEP

A Committee on Special Education ("CSE") convened on February 6, 2012

and developed an Individualized Education Program ("IEP") for S.B. for the 2012-13

---

[1]     Citations to "Ex." refer to the exhibit numbers contained in the Administrative Record.  Citations to "Tr."
Refer to the hearing transcript pages contained in the Administrative Record.  (ECF No. 15.)

school year.  At the IEP meeting, the participants relied on information from S.B.'s then-current teacher at Cooke Center Academy contained in a progress report from Cooke regarding her levels of academic, social, emotional, and physical functioning, a psychoeducational evaluation conducted in March 2011, a social history update from March 2011, a functional behavioral assessment and behavioral intervention plan from February 2012, and a classroom observation conducted several days before the CSE meeting.  (Exs. 4, 5, 6, 7.)

The IEP recommended that S.B. be placed in a special education class in a New York City Department of Education ("DOE") specialized school, with a 12:1:1 ratio (students : teacher : paraprofessional).  (Ex. 2 at 19.)  The IEP also recommended the services of a one-on-one full time crisis management paraprofessional.  (Ex. 2 at 17.)  It further recommended that S.B. receive speech-language therapy (group of 3 twice a week and individual service twice a week), physical therapy (group of 2 once a week), occupational therapy (group of 2 twice a week), and counseling in individual session (individual service once a week) and group session (group of 5 once a week).  (Ex. 2 at 16-17.)  Each of these sessions were recommended to last 40 minutes.  (Id.)  The IEP also set forth 20 annual goals, each accompanied by short-term objectives designed to measure progress towards the goals.  (Ex. 2 at 3-16.)  The IEP also recommended a 12-month program, meaning that S.B. was eligible to receive services in the summer months of July and August.  (Ex. 2 at 17.)

The IEP further stated that S.B. requires a "structured small classroom setting," a "crisis management paraprofessional to provide support when frustrated," and "counseling as a related service."  Her management needs and strategies include "preferential seating[,] [r]epetition of directions and concepts[,] [b]reak down [of] directions and concepts," "preview [of] expectations" and early communication," "sensory breaks, drinking water breaks[,] [c]hew gum and use of terra putty . . . deep breathing techniques," and "[u]se of a terra band to the desk." (Ex. 2 at 2-3.)

C.     Rejection of the Placement

On June 13, 2012, the DOE sent E.B. a final notice of recommendation for S.B. for the 2012-13 school year, identifying P079M @ Horan School ("P079M") as the proposed placement for implementing the IEP.  (Ex. C at 2.)  By this time, E.B. had already signed a 2012-13 school year enrollment contract with Cooke on May 1, 2012.  However, E.B. asserts that this was a back-up measure, as the contract provided E.B. with the option of withdrawing S.B. from Cooke and enrolling her in a DOE-recommended placement prior to October 31, 2012 without owing Cooke more than a deposit.  (Ex. N., Tr. 434, 439-40.)  After October 31, 2012, E.B. could still withdraw S.B. from Cooke for enrollment in a DOE-recommended placement and would be responsible only for pro-rated tuition at Cooke.  (Ex. N.)

On July 12, 2012, E.B sent a letter to the CSE indicating that she was not agreeing to a 12-month placement, which she understood was optional, and that she needed to visit P079M before making a decision as to the placement.  (Ex. B.)  On August 24, 2012, E.B. wrote another letter to the CSE stating that she was unable

to reach P079M by telephone and that she was unilaterally placing S.B. at Cooke in September 2012 until she can make a determination as to the appropriateness of the P079M placement.  (Ex. C.)

On October 12, 2012, E.B. visited P079M and was shown several 12:1:1 classrooms in which S.B. could potentially be placed.  On November 6, 2012, E.B. sent the DOE a letter formally rejecting the proposed school placement.  (Ex. D.)  In her letter, E.B. stated that she was "willing to consider any appropriate placement" and that she would be "willing to re-consider my decision about the offered placement on any detailed information that [the CSE] can provide."  (Id.)

D.    Decisions of the IHO and SRO

By a due process complaint dated October 20, 2013 but filed in November 2013, E.B. requested impartial hearing on behalf of S.B.  (Ex. A.)  E.B.'s challenge included substantive challenges to the content of the IEP, the procedural sufficiency of the CSE, and the appropriateness of the recommended placement.  As to the latter challenge, E.B. argued that the following issues she identified during her visit at P079M meant that the district failed to provide S.B. with a FAPE:

- Students in the observed classes ranged in age from 14 to 17, some of whom are older and larger than S.B.;

- The students in observed classes varied in functioning, including some who were autistic or emotionally disturbed;

- Some students appeared disengaged and did not receive individualized attention from the instructor;

- One curriculum was used with all students in the observed classes;

- The program focused on vocational skills, but S.B. needed a "strong academic program";

- The program would not help S.B. with daily living skills;

- The speech / language therapy in the observed classroom was "push in" rather than "pull out" as required by S.B.'s IEP;

- The DOE website stated that half of students who had mandated physical and occupational therapy did not receive it; and

- The school environment was too large, noisy, and tumultuous and would not provide sufficient support at lunch, recess, arrival and dismissal.

(Ex. A. at 4-6.)[2]

After four nonconsecutive days of hearing testimony (from April 21, 2014 to August 13, 2014), independent hearing officer ("IHO") Edgar De Leon issued his decision on November 12, 2014, finding that DOE had offered S.B. a FAPE.  The IHO found that the IEP was reasonably calculated to provide a meaningful benefit to S.B., and that although there were procedural problems with the CSE meeting, the deficiency did not amount to the denial of a FAPE.  (IHO Decision at 12, 16.) The IHO also found that E.B. could not prevail on her claim that the district would have failed to implement the IEP at P079M.  The IHO based his decision on his view of Second Circuit caselaw at the time—that the validity of the placement is to be judged by the written IEP plan and not as to how the IEP would have been executed.  (IHO Decision at 17-19.)

E.B. appealed the IHO decision to the Office of State Review.  Her appeal was exclusively focused on the ability of P079M to implement the program proposed in the IEP.  (Verified Petition ¶ 4; SRO Decision at 8, n.4.)  The State Hearing Officer ("SRO"), Carol H. Hauge, issued her decision upholding the IHO's findings and

---

[2]      Based on testimony at the IHO hearing, E.B. also challenged whether there was a spot available for S.B. in a 12:1:1 classroom in the beginning of the 2012-13 school year.

decision on August 31, 2015.  The SRO found that the IHO "carefully considered the testimonial and documentary evidence presented by both parties, and further, he weighed the evidence and properly supported his conclusions."  The SRO also conducted an independent review of the hearing record and found that the IHO hearing was properly conducted.  (SRO Decision at 6-8, 13.)  The SRO agreed with the IHO that the prevailing caselaw did not allow parents to bring a challenge based on how the district would have implemented the IEP.  (Id. at 11.)  The SRO also determined that in all events, the hearing evidence did not support plaintiff's position that P079M would have deviated from S.B.'s IEP in a material or substantial manner.  (Id. at 12.)

On June 26, 2015, plaintiffs filed the present action seeking reversal of the SRO's decision.

## II.   LEGAL FRAMEWORK

Before the passage of the IDEA and its predecessor, the Education for All Handicapped Children Act of 1975, "the educational needs of millions of children with disabilities were not being fully met."  20 U.S.C. § 1400(c)(2).  The IDEA seeks to rectify that state of affairs by requiring that states receiving federal funds provide all children with disabilities in the state a FAPE "that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A); see also id. § 1412(a)(1)(A).  "A FAPE consists of special education and related services tailored to meet the unique needs of a particular child, which

are reasonably calculated to enable the child to receive educational benefits." M.O. v. N.Y.C. Dep't of Educ., 793 F.3d 236, 238-39 (2d Cir. 2015) (quoting Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ., 760 F.3d 211, 214 (2d Cir. 2014)).

The IDEA ensures that all qualifying children receive a FAPE by requiring that school districts annually provide each child with an IEP, which "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." Honig v. Doe, 484 U.S. 305, 311 (1988) (citation omitted); see also 20 U.S.C. § 1414(d)(1)(A).   An IEP is adequate under the IDEA if it is "likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 254 (2d Cir. 2009) (citation and quotation mark omitted).  An IEP is not required to "furnish[] . . . every special service necessary to maximize each handicapped child's potential." Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 379 (2d Cir. 2003) (citation and internal quotation marks omitted).  In New York State, the formulation of IEPs is delegated to a local CSE, consisting of school board representatives, educators, clinicians, and parents.  N.Y. Educ. Law § 4402.

If, after a CSE meeting and the resulting IEP, a parent believes that their child is not receiving a FAPE, the parent may, at their financial risk, unilaterally enroll the child in a private school and seek tuition reimbursement from the school district.  M.O., 793 F.3d at 239.  The parent initiates this process by filing a due

process complaint (which is a statutory feature of the IDEA, not a constitutional process).  20 U.S.C. § 1412(a)(10)(C)(ii); N.Y. Educ. Law § 4404(1).

The parents may then proceed to a due process hearing before an IHO.  See id. § 1415(f)(1)(A).  The IHO makes a factual determination as to (I) whether the CSE's plan and placement for the student were appropriate and, if not, (II) whether the parent's chosen private school is appropriate and (III) whether the equities favor reimbursing the parent for their costs.  N.Y. Educ. Law § 4404(a).  The first prong requires consideration of both whether the IEP in question was developed according to the IDEA's procedural requirements and whether the educational plan it set forth was reasonably calculated to confer educational benefits on the student.  Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998).  A substantive violation (that is, an IEP not reasonably calculated to confer educational benefits) automatically leads to a finding for the parents on prong I, but procedural violations only do so if, considered cumulatively, they impede the student's right to a FAPE.  R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 190 (2d Cir. 2012).  The local school board bears the burden of establishing the first prong and the parents bear the burden of establishing the second and third.  M.O., 793 F.3d at 243.

The IHO's decision may be appealed by either party to the SRO, who independently reviews the findings and decision rendered by the IHO.  20 U.S.C. § 1415(g).  While the SRO's decision is considered final, a party aggrieved by that

decision may bring an action for relief in state or federal court with respect to the due process complaint presented to the IHO and SRO.  Id. § 1415(i)(1)(B), (i)(2)(A).

The court must conduct a two-part analysis to determine whether a school district has offered to provide a student with a FAPE.  First, the court asks whether "the State complied with the procedures set forth in the [IDEA]."  M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 245 (2d Cir. 2012)  (citation and internal quotation marks omitted).  Second, the court asks whether the IEP developed through the IDEA's procedures is "reasonably calculated to enable the child to receive educational benefits."  Id. (citation and internal quotation mark omitted).  In making this determination, the court keeps in mind that the IDEA only guarantees an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents."  Walczak, 142 F.3d at 132 (internal quotation marks omitted).

If the local school district has failed to comply with the procedural or substantive requirements of the IDEA in a manner that constitutes a denial of a FAPE, then the Court must inquire whether the private schooling obtained by the parents "is appropriate to the child's needs" and must weigh "equitable considerations relating to the reasonableness of the action taken by the parents." Id. (citations and internal quotation marks omitted).  If the local school district has denied the student a FAPE, if the private school placement is appropriate, and if the equities favor the parents, then the school district must reimburse the parents

for the "expenses that it should have paid all along." Id. at 246 (citation and internal quotation marks omitted).

III.   STANDARD OF REVIEW

A motion for summary judgment in an IDEA case is "in substance an appeal from an administrative determination, not a summary judgment [motion]." M.H., 685 F.3d at 226 (quoting Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005)) (internal quotation mark omitted).  The motion triggers review of "a state's compliance with the procedures set forth in [the] IDEA" and whether the challenged individualized education program ("IEP") is "reasonably calculated to enable the child to receive educational benefits." Id. at 225-26 (quoting Lillbask, 397 F.3d at 83 n.3).  "[B]asing its decision on the preponderance of the evidence, [the Court] shall grant such relief as [it] determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii).  The review is substantive and considers more than whether a material fact is disputed.

District courts independently review the administrative record and make determinations based on a preponderance of the evidence.  See M.H., 685 F.3d at 240.  Because the judiciary lacks expertise in educational policy, courts will not "substitute their own notions of sound educational policy for those of the school authorities which they review." Board of  Educ. of Hendrick Hudson Cent. Dist. V. Rowley, 458 U.S. 176, 206 (1982); see also R.E., 694 F.3d at 189  ("We must give 'due weight' to the state proceedings, mindful that we lack 'the specialized knowledge and experience necessary to resolve . . . questions of educational policy.'" (citation and internal quotation marks omitted)).  Thus, while IDEA administrative

determinations are subject to independent judicial review, both the Supreme Court and the Second Circuit have consistently construed the IDEA to "strictly limit[] judicial review of state administrative decisions." Grim, 346 F.3d at 380 (citations omitted); see also C.F. v. N.Y. City Dep't of Educ., 746 F.3d 68, 77 (2d Cir. 2014) ("The standard of review 'requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete de novo review.'" (quoting M.H., 685 F.3d at 244)).

However, "[t]he SRO's or IHO's factual findings must be 'reasoned and supported by the record' to warrant deference." M.H., 685 at 241 (quoting Galiardo, 489 F. 3d at 114). More deference is warranted when reviewing "the substantive adequacy of an IEP," the adequacy of an educational methodology, and records containing the same evidence that was before the SRO. Id. at 244. Less deference is warranted in appeals involving an IEP's procedural validity, objective indications of student progress, and records with new evidence. Id. In addition, when the hearing officer had opportunity to see and hear witnesses, his or her credibility determination is accorded deference. See K.R. ex rel. Matthew R. v. N.Y.C. Dep't of Educ., 107 F. Supp. 3d 295, 308 (S.D.N.Y. 2015); J.R. v. Board of Educ. Of City of Rye School Dist., 345 F. Supp. 2d 386, 399 (S.D.N.Y. 2004); see also M.H., 685 F.3d at 255.

In addition, "deference is especially appropriate" when the IHO and SRO are in agreement. A.M. ex rel. Y.N. v. N.Y.C. Dep't of Educ., 964 F. Supp. 2d 270, 285 (S.D.N.Y. 2013); Collins v. Bd. of Educ. of Red Hook Cent. Sch. Dist., 164 F. App'x

19, 21 (2d Cir. 2006) (holding that "deference is particularly appropriate" where "both the IHO's and the SRO's decision showed 'thorough and careful' review"). Deference to a well-reasoned SRO determination merits particular importance where the Court's decision rests solely on the administrative record.  See id. at 241. Where an SRO has concluded that an IEP was proper, the burden of demonstrating that the SRO erred falls on the plaintiff.  Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ., 760 F.3d 211, 219 (2d Cir. 2014).

IV.   DISCUSSION

Plaintiff's case before this Court is solely based on the appropriateness of P079M as a placement for implementing S.B.'s IEP.  Although plaintiff had challenged the procedural adequacy of the CSE meeting in setting the IEP and the substantive adequacy of the IEP itself, she has since abandoned those challenges at the SRO level and has not raised them here.[3]  (See SRO Decision; Pl.'s Mem. in Opp. to Def.'s Cross Mot. for Summ. J., at 10, n. 2.)  Thus, this Court only reviews the decision with respect to the appropriateness of the proposed P079M placement.

For the purposes of this motion, the Court also assumes that although plaintiff made a tuition down payment on May 1, 2012 for S.B.'s 2012-13 school year at Cooke, her formal rejection of the district's placement did not occur until November 6, 2012.  Plaintiff's letters to the CSE in July, August, and November

---

[3]      Moreover, because parties may only bring a civil action with respect to the findings and decisions of the SRO, 20 U.S.C. § 1415, failure to exhaust remedies in two-tier IHO and SRO process "deprives the [district] court of subject matter jurisdiction."  Cave v. E. Meadow Union Free Sch. Dist., 514 F.3d 240, 245 (2d Cir. 2008).

2012 indicate that although she had rejected the optional summer placement, she was nevertheless still considering enrolling S.B. in P079M for the academic year.

A.    Capacity to Implement S.B.'s IEP

The IHO and SRO determined a parent could not legally bring a claim regarding the implementation of the IEP based on retrospective analysis of how the proposed placement school would have implemented the IEP; instead, the validity of the placement was to be judged solely from the face of the IEP. (SRO Decision at 11-12; IHO Decision at 18.) However, after the IHO and SRO issued their decisions, in M.O. v. N.Y.C. Dep't of Educ., 793 F.3d 236, 244 (2d Cir. 2015), the Second Circuit clarified that there are circumstances in which a parent can challenge the placement prior to the students' attending the school if the placement school is "facially deficient" and "cannot satisfy the IEP's requirements." The M.O. decision clarified the Second Circuit's prior opinion in R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 186 (2d Cir. 2012), which held that school districts cannot use "retrospective testimony that the school district would have provided additional services beyond those listed in the IEP" in order to defeat a parent's claim even though the IEP is "materially defective." Id. In M.O., the Second Circuit held that although R.E.'s held that "it is speculative to conclude that a school with the capacity to implement a given student's IEP will simply fail to adhere to that plan's mandates," it is also "not speculative to find that an IEP cannot be implemented at a proposed school that lacks the services required by the IEP." M.O., 793 F.3d at 244 (internal citation omitted). In effect, parents do not need to "send their child to a facially deficient placement school prior to challenging that school's capacity to implement

14

their child's IEP," because that would be "antithetical to the IDEA'[s] reimbursement process." Id.

Here, plaintiff challenges whether the SRO and IHO erred in determining that any challenge to the BOE's decision must come in the form of a facial challenge to the IEP (versus a factual inability to implement the IEP).  Under M.O., plaintiff is correct.[4]

This does not, however, necessitate reversal.  It requires that the Court examine whether plaintiff's specific claims are cognizable challenges to implementation under the M.O. framework.  In doing so, the Court does not "substitute [its] own notions of sound educational policy for those of the school authorities which they review," Rowley, 458 U.S. at 206, but rather evaluates whether the type of challenge posed by plaintiff is appropriate under Second Circuit precedent.

First, M.O. requires that any challenge to the implementation of the IEP be in the form of identifying that a "proposed school . . . lacks the services required by the IEP"—i.e., a "facial deficiency"—rather than arguing "that a school with the capacity to implement a student's IEP will simply fail to adhere to that plan's mandates."  M.O., 793 F.3d at 244-45.  M.O. allows parents to make a narrow

---

[4]        The SRO also made an alternative conclusion that even if such a challenge to the BOE's implementation of the IEP were permitted, "the evidence in the hearing record does not support the conclusion that the district would have violated the FAPE legal standard related to IEP implementation."  (SRO Decision at 12.)  However, this conclusion not "thorough and careful" in its reasoning and analysis and did not cite to any record evidence.  Walczak, 142 F.3d at 129.  The IHO—who did not engage in any "arguendo" analysis—did not make any factual findings as to the implementation of S.B.'s IEP.  Thus, the SRO's decision is not entitled to deference.  See F.B. v. N.Y.C. Dep't of Educ., 132 F. Supp. 3d. 522, 549-50 (S.D.N.Y. 2015).

challenge to a proposed placement on the basis that the school cannot implement

the IEP.  Such challenge must be based on the school's factual inability to

implement the IEP.  Some examples include:

1) A school that was not seafood-free could not implement an IEP
   recommending a seafood-free environment for a child with a severe allergy.

2) A school that had only in-class occupational therapy could not implement the
   one-on-one occupational therapy recommended by the IEP.

3) A school that did not have a second grade classroom could not implement an
   IEP that recommended the student repeat second grade.

M.O., 793 F.3d at 244, 245 n.7.

The issues raised by plaintiff in this case cannot be characterized as potential

"facial deficienc[ies]" or factual incapacity to implement the IEP.  Id., 793 F.3d  at

244.  They primarily comprise E.B.'s observations of how certain P079M classrooms

functioned during her visit.  That visit did not include an observation of how the

classroom would function with S.B.'s presence.  In other words, these complaints are

not based on what P079M would lack, but rather what P079M was not doing in the

absence of S.B. as a student.  For example, regarding E.B.'s complaint that the

speech / language therapy in the observed classroom did not operate on a "pull-out"

basis, there is no indication that the students in that particular classroom at the

time required pull-out therapy as S.B. did.[5]  Challenges based on the noise level of

---

[5]    The question of whether P079M had the capacity to provide a 12:1:1 classroom for S.B. upon
enrollment was not raised until the IHO hearing.  (See Ex. A (E.B.'s due process complaint which did
not mention the classroom roster issue.)  Because R.E. held that "both parties are limited to
discussing the placement and services specified in the written plan and therefore reasonably known
to the parties at the time of the decision," 694 F.3d at 187, alleged violations adduced for the first
time at the IHO hearing cannot be used as a basis for challenging the placement.  See M.T. v. N.Y.C.
Dep't of Educ., 15 Civ. 5226 (RJS), 2016 WL 1072491 *9 (Feb. 26, 2016).

the school or the potential for emotionally disturbed peer students to frustrate S.B. are similarly speculative and not proper challenges to the <u>capacity</u> of the placement school to implement the IEP.  Rather, these challenges are based on what the parent observed the school was offering at a particular point in time—without the specific student's enrollment and the school's opportunity to comply with the IEP for that student.  In contrast, a proper challenge would be based on whether the district was "unwilling or unable" to implement aspects of the IEP "should [the child] have been enrolled" at the placement school.  <u>B.K. v. N.Y.C. Dep't of Educ.</u>, 12 F. Supp. 3d 343, 372 (E.D.N.Y. 2014).

Plaintiff's challenge that her daughter would be underserved at P079M are precisely the types of challenges that the <u>R.E.</u> court rejected.  The R.E. court held that a claim that a student's IEP "would not have been effective implemented . . . because defendant's own internal documents show that a large percentage of students at [the school] had been and continue to be underserved for related services," is speculative and "not an appropriate basis for unilateral placement." <u>R.E.</u>, 694 F.3d at 195.  For the reasons stated above, plaintiff's challenge fails.  <u>See</u>

---

Moreover, plaintiff's challenge on this basis is misplaced because it is entirely based on a witness's testimony as to class rosters that existed in September 2012 <u>absent</u> S.B.'s enrollment.  The testimony showed only that the class rosters at that time were made up in a certain way.  For example, classroom "V07" had 11 students whose birth years were 1993 and 1994; "V08" had 13 students whose birth years spanned from 1991 to 1995; "V10" had 12 students whose birth years spanned from 1995 to 1998.  (Tr. 252-58; Ex. I.)  Because state regulations require that the chronological age range of students in a special education class must not exceed 36 months, 8 NYCRR § 200.6(h), S.B.—who was born in 1997—could not have been slotted into the P079M classes as they existed at that time.  This argument is meritless because it is based on class rosters programmed without S.B.'s enrollment.  If S.B. had enrolled, it is possible that a student born in 1995 could have been shifted from V10 to V07 (which had only 11 students), making room for S.B. in the V10 classroom.  (<u>See</u> Ex. I. at 2.)  The Court is not suggesting that this was the option that P079M would have chosen.  Rather, it is observing that the particular over-enrollment argument as posed by plaintiff in this case is unpersuasive because it does not take into account how the school could have adjusted the rosters to comply with S.B.'s IEP.

E.P. v. N.Y.C. Dep't of Educ., 15 Civ. 6066 (RA), 2016 WL 3443647 at *9 (Jun. 10,
2016) (holding that challenges based on the capacities of prospective peers is
"squarely within the category of impermissible challenges" because it is "based on a
presumption that the DOE would fail to comply" with the IEP and that the parent's
subjective account of the other students' functioning is "insufficient evidence to
raise [plaintiff's] concerns above a speculative level"); J.M. v. N.Y.C. Dep't of Educ.,
15 Civ. 353 (VEC), 2016 WL 1092688  at *9-10 (S.D.N.Y. Mar. 21, 2016) (holding
that challenges based on size of the school, noise, and potential for missed
socialization during lunchtime were "based on Plaintiff's subjective belief that the
school would have been inappropriate" and are foreclosed by M.O. and R.E.); M.T. v.
N.Y.C. Dep't of Educ., 15 Civ. 5226 (RJS), 2016 WL 1072491 at  *9 (Feb. 26, 2016)
(holding that allegations that classroom age range and variation in functional levels
were inappropriate for the student "hardly suggest that [the placement school]
lacked the *capacity* to implement [the] IEP, as they at most suggest that [the
student's] class *might* include what [the parent] considered to be an 'inappropriate'
peer grouping or fail to deliver related services as prescribed" (emphasis in
original)); N.M. v. N.Y.C. Dep't of Educ., No. 15 Civ. 1781 (JMF), 2016 WL 796857
at *9 (S.D.N.Y. Feb. 24, 2016) (holding that plaintiff's allegations "that the school
did not have adequate adaptive learning, travel training, or vocational offerings"
and that the student "might have to wait" to participate in a program are "by their
own terms, speculative" and therefore impermissible implementation challenges).

While the Court is sympathetic to E.B.'s concerns, the evaluation of the school district's determinations can only be made based on evidence as to whether the school "would not or could not deliver a FAPE," not a parent's "sense that a school might not adhere to an IEP." N.S. & O.S. v. N.Y.C. Dep't of Educ., 13 Civ. 7819 (VEC), 2014 U.S. Dist. LEXIS 83921, at *45 (S.D.N.Y. Jun. 16, 2014). In other words, absent a facial lack of capacity to implement the IEP, the school district must be given an opportunity to try to do so. Instead, parents could "pay tuition elsewhere or enroll [at the placement school] with the threat of an ex post lawsuit in their pocket" via a "later proceeding to show that the child was denied a [FAPE]"; however, they "cannot . . . unilaterally place the child elsewhere and then force the school district to reimburse their tuition based on their subjective belief that the school would not have complied with the IEP." Id.

Second, a number of E.B.'s challenges to the appropriateness of P079M are not implementation challenges but rather "substantive attacks on [S.B.'s] IEP that were couched as challenges to the adequacy" of the school. M.O., 793 F.3d at 245. In M.O., the Court rejected certain complaints that were styled both as implementation challenges and IEP challenges. Id. Here, plaintiff acknowledges her implementation challenges were also raised as challenges to the IEP itself. (Pl.'s Mem. in Opp. to Def.'s Cross Mot. for Summ. J., at 10.) Moreover, complaints such as that students in P079M classes varied in age and that some had emotional disturbances are not proper implementation challenges: they are implicit arguments that the IEP should have contained a recommendation for S.B. to be in

19

class only with individuals her own age, or that S.B. not be placed in class with certain classmates.  These specifications were not in the IEP, and plaintiff cannot raise them as an "implementation" challenge instead.  See, e.g., N.M., 2016 WL 796857, at *9.

Finally, this Court agrees with defendants that there is a rebuttable presumption that the placement school is capable of fulfilling the IEP and plaintiff has not produced sufficient evidence to overcome that presumption.  Although plaintiff seems to suggest that the school district must prove that the placement is adequately equipped to implement all aspects of the IEP, M.O. does not require that the district has the burden of "produc[ing] evidence demonstrating [the placement school's] adequacy" absent a true challenge as to the school's "capacity to implement the IEP."  Id., 793 F.3d at 245; see also B.P. v. N.Y.C. Dep't. of Educ., 634 Fed. App'x. 845 (2d Cir. 2015) ("M.O. further clarified that challenges to proposed placements can "trigger a duty on the part of the school district to provide evidence regarding [the placement school's] adequacy.' " (alterations in original, emphasis added)).  In a decision issued before M.O. but based on the principle that "school districts are not permitted to assign a child to a school that cannot satisfy the IEP's requirements," the court noted that the school district "discharges its [burden of proof] by establishing a student's IEP is substantively and procedurally adequate . . . It is then incumbent upon the parents to establish that the school district would not have adhered to the written plan."  N.S., 2014 U.S. Dist. LEXIS 83921 at *46

(collecting cases); see also S.E. v. New York City Dep't of Educ., 113 F. Supp. 3d 695, 707 (S.D.N.Y. 2015).

Thus, "[a]bsent non-speculative evidence to the contrary, it is presumed that the placement school will fulfill its obligations under the IEP." Id.; see also J.S. v. N.Y.C. Dep't of Educ., 104 F. Supp. 3d 392, 413 (S.D.N.Y. 2015) ("[P]laintiffs bear the burden of proof on prospective challenges to the adequacy of a proposed placement." (quoting S.W. v. N.Y.C. Dep't of Educ., 92 F.Supp.3d at 162 n. 9 (S.D.N.Y. 2015)), aff'd sub nom. J.S. v. N.Y.C. Dep't of Educ., No. 15-1827-CV, 2016 WL 2342490 (2d Cir. May 4, 2016); J.M. v. N.Y.C. Dep't of Educ., No. 15 Civ. 353 (VEC), 2016 WL 1092688, at *8 (S.D.N.Y. Mar. 21, 2016) ("M.O. also clarifies who bears the burden of showing that the proposed placement has the capacity to implement the student's IEP. If a student's IEP is substantively adequate, it is incumbent upon the parents to adduce some evidence that the school could not or would not have adhered to the IEP."). Because plaintiff's claims are based on her one-time observations and subjective conclusions, they are not sufficient to overcome the presumption that the proposed placement was capable of implementing the IEP. See, e.g., J.D. on behalf of A.P. v. N.Y.C. Dep't of Educ., No. 14 Civ. 9424 (ER), 2015 WL 7288647, at *16 (S.D.N.Y. Nov. 17, 2015) ("Plaintiff's own testimony that [school] officials made comments to her indicating an inability to effectively serve [the student] do not come close to proving that the school was 'factually incapable' of implementing the IEP, and was thus properly excluded from consideration by the SRO.").

B.    Procedural Violations Related To Placement Visit

Plaintiff also argues that because P079M did not respond to her efforts to schedule a visit, she suffered a due process violation that impeded S.B.'s right to a FAPE.  Embedded in a parent's right to challenge the capacity of a proposed placement to implement the IEP are "certain procedural rights that are necessary to effectuate those substantive rights."  E.P., 2016 WL 3443647 at *11; F.B., 132 F. Supp. 3d. at 541-42 ("[T]he crux of the right to meaningfully participate in the school selection process is the right . . . to evaluate the school assignment, i.e., the right to acquire relevant and timely information as to the proposed school." (internal citations omitted)).  Here, plaintiff advances a cognizable claim that her procedural rights were violated when P079M failed to respond to her phone calls and messages requesting a visit.

However, plaintiff has not demonstrated that S.B. was denied a FAPE as a result.  Relief is warranted only if the alleged procedural inadequacies "(I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of [a FAPE] to the parents' child; or (III) caused a deprivation of educational benefits."  20 U.S.C. § 1415(f)(3)(E)(ii).

It is undisputed that E.B. did end up visiting P079M in October 2012 and then rejected the placement.  The Court is mindful that a reasonable parent might—like E.B.—be "understandably frustrated by the Placement School's and DOE's failure to respond to her letters and phone calls," E.P., 2016 WL 3443647 at *11, but to prevail, a plaintiff must link any procedural errors and delays to a

22

significant impeding of the child's right to a FAPE or the parent's "opportunity to participate in the decisionmaking process." Id.  In the cases where courts have determined that a procedural failure in the placement context led to the denial of a FAPE, the parent never had any meaningful opportunity to visit or evaluate the placement school.  See E.P., 2016 WL 3443647 at *11; C.U. v. N.Y.C. Dep't of Educ., 23 F. Supp. 3d 210 (S.D.N.Y. 2014); V.S. v. N.Y.C. Dep't of Educ., 25 F. Supp. 3d 295 (E.D.N.Y. 2014).  Because plaintiff did in fact obtain an opportunity to visit P079M, and because she has not advanced any evidence that S.B. was denied a FAPE as a result of the school's untimely response to her visitation request, plaintiff cannot prevail on her procedural violation claim.

V.     CONCLUSION

The Court has reviewed the parties' other arguments and finds that they are without merit.  For the reasons set forth above, plaintiff's motion for summary judgment is DENIED and defendant's cross-motion is GRANTED.  The Clerk of Court is directed to terminate the motions at ECF Nos. 16 and 18 and to terminate this action.

SO ORDERED

Dated:      New York, New York
            July 12, 2016

_____
        KATHERINE B. FORREST
        United States District Judge